743 So.2d 251 (1999)
Harry BURGESS
v.
C.F. BEAN CORPORATION.
No. 98-CA-3072.
Court of Appeal of Louisiana, Fourth Circuit.
August 18, 1999.
Writ Denied November 24, 1999.
*253 Lawrence Blake Jones, David C. Whitmore, Scheuermann & Jones, New Orleans, LA, Counsel for Plaintiff/Appellee.
*254 Alan K. Breaud, Breaud & Lemoine, Lafayette, LA, Counsel for Defendant/Appellant.
Court composed of Chief Judge ROBERT J. KLEES, Judge STEVEN R. PLOTKIN, Judge JAMES F. McKAY III.
PLOTKIN, Judge.
Defendant, C.F. Bean Corporation appeals from the trial court judgment finding it liable for the injuries sustained by Plaintiff, Harry Burgess. Plaintiff cross-appeals, arguing that the trial court awarded him inadequate damages.

FACTS:
Harry Burgess alleges that he suffered permanent disabling injuries while working for C.F. Bean Corporation (hereinafter, Bean). He claims that while unloading pipes, he was knocked off of a pile of pipes, permanently injuring his shoulder.
Mr. Burgess testified that he has been a maritime worker since he was 15 years old. He claims that he never suffered any injuries until the instant accident when he injured his shoulder. Prior to beginning his employment with Bean, he had to submit to a physical examination. His employment was conditioned on passing the exam, which he did. He began his employment with Bean at the end of September 1993. He was injured within three weeks of the commencement of his employment. He originally believed he was injured on September 13, 1993 but admits that he was not employed by Bean on that date.
He offered the following account of the accident. A truckload of plastic pipes arrived at the Bean yard after the workers had left for the day. Thus, he, Donald Derbes and J.M. Fail unloaded the pipes alone. Derbes was operating the crane that was lifting and moving the pipes. Between the crane and the growing pile of unloaded pipes, there were large storage containers. These containers obstructed Mr. Derbes view of where he was swinging the pipe. Mr. Burgess was standing on the pile of unloaded pipes, unhooking them when they arrived. He alleges that Mr. Fail distracted him, causing him to be hit by an approaching pipe and knocked off of the pile, landing on his left shoulder and side. He stated that there was no flagman because the unloading process was taking place after his crew had left for the day. He also stated that it was dark and the Bean yard has no artificial lighting. Furthermore, he stated that this type of unloading should never have been done by only three people. He said that he was in pain at the time the accident occurred, but he did not see a doctor or discontinue working. Within two months of the accident, the PROTEUS was ready and left for Raccoon Island. Mr. Burgess was working aboard the PROTEUS during this project.
Burgess testified that he is permanently injured and disabled, thus unable to return to his prior employment, or any other physical employment. He stated that he is in constant pain and must regularly ingest prescription painkillers to alleviate his pain. He is also suffering from depression due to his inability to work, but is getting better with the help of a psychiatrist.
Mr. Burgess admitted to purchasing a shrimping boat after leaving Bean. But, he alleges that he is only physically able to take the boat out sporadically and must employ someone to do the physical work on the boat. He claims that he has actually lost money shrimping.
J.M. Fail, who was Mr. Burgess's supervisor, testified that Mr. Burgess was a very hard worker  a "work horse." He stated that Mr. Burgess was hired to help "put the PROTEUS back together marrying it with the BOOSTER 19." He stated further that the specific title Mr. Burgess had while at Bean at the time he was injured was "leverman." A leverman operates the dredge and is responsible for the crew. Mr. Fail denies witnessing the accident. However, he did testify that on the night of the accident, Mr. Burgess told *255 him that he was injured and how he was injured. He further stated that on the night of the accident, Mr. Burgess informed him he did not need to see a doctor and would resume his duties at Bean.
Mr. Donald Derbes testified that he was the crane operator at Bean at the time of plaintiff's injury. He was operating the crane that was moving the pipe that allegedly hit Mr. Burgess. He testified that a truckload of 50-foot plastic pipes arrived at the Bean shipyard. But, he further testified that he was unloading the pipe with Mr. Burgess and six to eight other people. He admitted that his vision was obstructed as to 10 feet of the 50-foot pipe by storage containers that were being used as offices. However, he denies ever swinging the pipe in such a manner that Mr. Burgess was hit by it and knocked off of the pile of pipes. In fact, he testified that Mr. Burgess was not directly involved in the pipe unloading, rather he was supervising the operation. He stated he was aware that Mr. Burgess had been injured at some point, because when he tapped him on the shoulder once, Mr. Burgess told him of his injury and pain.
Charlotte Burgess, the plaintiff's wife, testified regarding Mr. Burgess's injury. She stated that he is in constant pain and suffers from depression. She also testified that he did not see a doctor at the time of the accident because he is a strong and proud man. She testified that plaintiff is not able to work and rarely took the boat shrimping because the rigors of operating a shrimping boat were too much for him to handle.
The defendant presented the testimony of Billy Naquin. Mr. Naquin is a physical therapist who was consulted to determine Mr. Burgess's functional capacity. He stated that after testing Mr. Burgess, he determined that Mr. Burgess was not performing to his maximum capacity due to his own self-limiting behavior. As an example, he stated that Mr. Burgess was unable to walk .25 miles, but that if his only complaint is shoulder pain, the inability to walk was not physically connected. He also stated that Mr. Burgess's pain does not match his objective findings; he should not be experiencing the problems he is experiencing. However, on cross-examination, Mr. Naquin admitted that Mr. Burgess might be limiting his behavior because he is in pain.
Jennifer Palmer also testified for the defendant. She is an expert in vocational rehabilitation. She interviewed and tested the plaintiff to determine his post-injury employability. She reviewed the records of the physicians consulted in this matter. She concluded that based on Mr. Burgess's injury and work experience, he would be able to return to work as a dredge leverman or captain. She stated that he could also work as a consultant and had done so in the past. She testified to several jobs available at the time of trial to a man with Mr. Burgess's credentials. She stated that under the U.S. Department of Labor guidelines, the work that plaintiff performs is considered "light" and he should have no problem returning to that line of work. She stated that if hired as a leverman or captain, Mr. Burgess would not technically be required to do extraneous labor.
Dr. Warren, a neurologist, was consulted on July 8, 1994, by Mr. Burgess and testified by deposition. Dr. Warren testified that Mr. Burgess initially had pain in his left shoulder but did not complain of any numbness, tingling or weakness, the absence of which, signifies a lack of nerve damage. He testified that Burgess told him he developed neck and head pain shortly before the first visit; approximately nine months after the accident.
He testified further that his examination of Mr. Burgess's neck showed decreased motion due to pain. But, he testified that against resistance, Mr. Burgess's shoulder shrug and all other strength tests were normal. He stated that cervical spine x-rays he examined were normal. He opined that normal strength results signified a lack of nerve compression or dysfunction *256 such as a pinched nerve in the neck. Thus, he determined the left shoulder pain was orthopedic. He further stated that with any nerve injury, the pain would be radiating and Mr. Burgess lacked radiating pain. Dr. Warren also testified that he has doubts whether there is any relationship between the accident in September 1993 and the pain Mr. Burgess experiences in his neck and shoulder. However, he stated he ordered further testing to rule out other neurological ailments. The results of the CT scan performed were normal.
Dr. Warren was then asked to review the results of electromyelogram (EMG) and nerve conduction velocity (NCV) tests. He said that the NCV was totally normal and that the EMG results were normal except that one of the thirty-two areas tested resulted in a one plus positive result. He stated that this was minimal; a minor abnormality. Dr. Warren was also told of the results of other diagnostic tests performed on Mr. Burgess. Specifically, the MRI by Dr. Gold which showed spondylitic changes and a bulging disk at C3-4, C5-6, and the cervical myelogram and post myelogram scans which showed no evidence of nerve root compression. Based on his findings and the results of the above tests performed by other doctors, Dr. Warren opined that Mr. Burgess has no neurological impairment. He believes Mr. Burgess's problem is basically degenerative disk disease. He sees no connection between the accident and the resulting neck and shoulder pain. However, on cross-examination, Dr. Warren stated that asymptomatic arthritis can become symptomatic due to trauma.
Dr. Shobe, an orthopedic surgeon, first saw Mr. Burgess on August 30, 1994. He stated that Mr. Burgess complained of pain in his cervical spine, left shoulder and head. Mr. Burgess also complained of weakness in his left shoulder but not of feeling in his fingers. He stated the X-rays of the cervical spine and shoulder were normal. He said the results of the arthrogram were normal.
He testified that at a subsequent visit, he noticed shoulder impingement. He noted that this is a common syndrome for shoulder pain. He also noted an objective finding of pain  that there was grinding upon palpation. He opined that bursitis or degenerative changes probably caused the grinding. He further opined that he does not believe Mr. Burgess has any neck problems whatsoever. He stated that degenerative changes in the AC joint could be asymptomatic but become symptomatic due to trauma. He stated he would be very surprised if there were any neurological findings because Mr. Burgess's MRIs were normal and he lacked neurological symptoms, such as numbness, tingling, or loss of sensation or reflexes.
Dr. Charles King is an orthopedic surgeon and is a partner of Dr. Shobe. Dr. Shobe no longer does surgery and when he believed an arthroscope was an option, Dr. Shobe referred Mr. Burgess to Dr. King. Dr. King began treating Mr. Burgess in August of 1994 for left shoulder and neck pain. He reviewed an MRI and found it to be normal. He suggested therapy and medication. He also reviewed the notes of another orthopedist that Mr. Burgess saw, Dr. Hagen. Based on Dr. Hagen's notes and his own examination, he believed that Mr. Burgess was suffering from impingement of the tendon or rotator cuff problems. Dr. King recommended that Mr. Burgess see a neurosurgeon and referred him to Dr. Gold.
Dr. King performed arthroscopic surgery on Mr. Burgess on March 21, 1995. The arthroscope was normal and there was no tear in the rotator cuff or cartilage. When the arthroscope was normal, he decided to decompress the shoulder to relieve some of Mr. Burgess's arthritis. He removed the arthritic portion of the distal clavicle and removed some bone from over the rotator cuff so there was more room to move. Dr. King testified that this level of arthritis and spur formation were normal *257 for a man Mr. Burgess's age who performed physical labor. He also opined that Mr. Burgess may be suffering from tendonitis, but that the only finding he saw after examining all of the diagnostic tests was arthritis in the AC joint. He too admitted that asymptomatic arthritis could become symptomatic due to trauma.
Dr. Gold, a neurosurgeon, first saw Mr. Burgess on January 13, 1995. In his history, he noted that Mr. Burgess told him had been experiencing neck and shoulder pain for the past 18 months. He stated that Mr. Burgess had no complaints of arm pain or weakness. He noted that there was some numbness in the middle two fingers of the left hand. He treated Mr. Burgess with injections into the left shoulder which did not provide relief. He noted that the cervical range of motion was somewhat limited. He stated that his exam revealed no neurological findings; he detected no cervical root pathology. The MRI he reviewed showed degenerative disk changes in the cervical spine. He opined that perhaps Mr. Burgess was suffering from left shoulder impingement.
He next saw Mr. Burgess on May 22, 1995. Mr. Burgess complained of the same pain. He had undergone surgery since the last visit and the range of motion of his shoulder was much better. Mr. Burgess complained of persistent headaches and neck pain. He again opined that Mr. Burgess had no neurological problems and his head and neck pain was due to an undetermined etiology. Dr. Gold further opined that a pain management program would probably help Mr. Burgess, but would not effect his physical condition. He gave Mr. Burgess a 5% total disability rating and stated that maximum medical improvement had been reached. He further stated that he believed Mr. Burgess could return to work, initially lifting under ten pounds and gradually increasing to up to forty pounds. He stated his evaluation was made only from the standpoint of the cervical spine.
He saw Mr. Burgess again on December 19, 1996. Mr. Burgess complained of worsened intrascapular pain, and left shoulder pain radiating to the elbow. He told Dr. Gold he now had decreased sensation in all of his fingers on his left hand. Dr. Gold reviewed more MRIs and opined that there was arthritic change in C3-4 C5-6. Mr. Burgess also complained of arm pain, which was a new complaint. Dr. Gold stated that the loss of sensation could be due to neurological impingement or nerve root or nerve compression. He then conducted tests to make this determination. Specifically, he did a post-myelogram C-T scan, which showed no evidence of any nerve root compression at any level. Dr. Gold opined that the only objective cause of Mr. Burgess' pain was cervical degenerative disk disease.
On cross-examination, Dr. Gold admitted that the weakness in the left arm could be due to pain and that the degenerative change could be due to trauma. He also stated that the neck pain could cause headaches and that subjective pain was not covered in the AMA disability guidelines, thus his 5% disability rating did not take into account pain. He also admitted that the onset of numbness could signify underlying neurological or nerve problems. However, he stated that based on his exams his only finding is that Mr. Burgess suffers from degenerative disk disease.
Mr. Burgess started sessions with Dr. Hurayt, a psychiatrist, on March 1, 1995. Dr. Hurayt stated that he believes Mr. Burgess's attorneys referred him because he was suffering from increasing depression, marital problems and chronic pain. His preliminary diagnosis was major depression and post-traumatic stress disorder secondary to his inability to work, the trauma that he had experienced and the frustration that he had experienced. He prescribed the plaintiff antidepressants and painkillers. He opined that Mr. Burgess's pain is real because he has done everything he has been told to do in an effort to alleviate it. He also stated that *258 he believes Mr. Burgess would work if he could based on his past work record and his feelings of uselessness. He says he is unable to work because exertion exacerbates the pain and because of physical and mental factors. He stated that since his accident, Mr. Burgess has had drinking problems. His final diagnosis is chronic pain syndrome and depression.
Dr. Gambrell testified that he is a family practitioner but also does sports medicine, which encompasses non-surgical orthopedics. However, he is not an orthopedist.
Dr. Gambrell first saw Mr. Burgess on January 4, 1996. His initial exam was consistent with impingement and bursitis. However, he stated that the lack of improvement and continued neck tenderness led him to believe there was more going on. He ordered an electromyogram to evaluate for radiculopathy, which is irritation or inflammation or damage to the nerve root. The EMG showed denervation changes in the cervical paraspinal muscles on the left side of his neck and he was diagnosed with a left unspecified cervical radiculopathy. He stated that denervation means that the nerve supply to that muscle had been injured  the paraspinal muscle is the muscle where the neck and shoulder meet. After another visit, he referred Mr. Burgess to a pain clinic because there is no treatment for his nerve injury. He did prescribe epidural steroid injections to help alleviate the pain. He opined that Mr. Burgess is suffering from a severe disability preventing him from using his left arm, shoulder and upper body in any normal capacity. He said Mr. Burgess is permanently and totally disabled.
On cross, Dr. Gambrell stated that he did not review any of the other diagnostic tests conducted by the other doctors. (i.e. the X-rays, MRIs, CT scans etc.) He stated that the nerve conduction velocity studies he conducted were normal on the evaluated nerves. The motor unit potentials were normal. Regarding the EMG  he admitted that of the total thirty-two areas tested, only one was positive. He also stated that this was a minimal finding and that the NCV and the EMG were otherwise normal. He stated that other than pain, there were no other signs of autonomic dysfunction. The reason that he stated Mr. Burgess was totally disabled was because of the pain and dysfunction. He stated that the pain persisted beyond a reasonable recovery period.
On re-direct, Dr. Gambrell stated that a person could have nerve damage without disk involvement or arthritic involvement.
Based on these facts, the trial court awarded the following damages:

Past and future physical and mental pain
 and suffering: $100,000.00
Past medical expenses: $ 14,989.93
Future medical expenses: $ 15,000.00
Past lost wages: $ 32,850.12
Loss of future earnings capacity: $163,319.27
Unpaid maintenance: $ 13,290.00

BEAN'S ASSIGNMENT OF ERROR ONE:
In its first assignment of error, Bean argues that Mr. Burgess was not entitled to recover under the Jones Act because he is not a Jones Act seaman.
When the United States legislature promulgated the rule allowing for Jones Act recovery for seaman, no definition of seaman was enunciated. Thus, through the years, courts have sought to determine who is a seaman under the Jones Act. The determination is important because Jones Act protection is reserved for sea-based maritime employees whose work regularly exposes them to the special hazards and perils of the sea.
The issue of seaman status has been modified and expanded recently. The United States Supreme Court, in Chandris v. Latsis, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995), established the two-prong test that is used as the basis for determining seaman status. The Court stated that first, "an employee's duties must `contribut[e] to the function of the vessel or to the accomplishment of its mission.'" Id. at 368, 115 S.Ct. at 2190. Next, "a seaman must have a connection to *259 a vessel in navigation ... that is substantial in terms of both its duration and its nature." Id. In other words, one who, only by happenstance, is injured while on a vessel, should not be entitled to the benefits associated with Jones Act seaman status. Rather, a seaman must have a special nexus to a vessel or fleet of vessels. Importantly, the Court further determined how to address a reassignment of duties. "If a maritime employee receives a new work assignment in which his essential duties are changed, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new position." Id. at 372, 115 S.Ct. at 2191-92.
Subsequent to the Chandris decision, the Supreme Court revisited the issue of seaman status again in, Harbor Tug & Barge Co. v. Papai, 520 U.S. 548, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997). The Court determined that for status purposes, courts should not consider a potential seaman's prior work experience with prior different employers. This was based on the belief that there would be no feasible means to limit which prior work experiences would be considered. Id. at 558, 117 S.Ct. at 1541.
Louisiana courts have interpreted and applied these recent Supreme Court cases regarding seaman status in an effort to clearly define who is a Jones Act seaman. See, Doucet v. Computalog Wireline Services, Inc., 97-551 (La.App. 3 Cir. 10/29/97), 702 So.2d 1064; Capiello v. Exxon Corp., 96-2418 (La.App. 4 Cir. 5/28/97), 695 So.2d 1097; Howell v. American Cas. Co. of Reading, Pennsylvania, 96-0694 (La.App. 4 Cir. 3/19/97), 691 So.2d 715. In Waller v. American Seafoods Co., 97-0302 (La.App. 4 Cir. 10/1/97), 700 So.2d 1306, writ not considered by, 97-2769 (La.1/30/98), 709 So.2d 693, this Court reiterated that it is not the employee's particular job that is determinative, but the employee's connection to a vessel. Moreover, it was determined that seaman status necessarily involves a temporal element because the employment-related connection to the vessel must be substantial in terms of both its nature and duration. Also, when a maritime worker divides his time between land-based and sea-based employment, courts must weigh the total circumstances of the individual's employment to determine his/her status. The "rule of thumb" for this inquiry is that a worker who spends less than 30% of his time in the service of a vessel in navigation should not qualify as a seaman.
In Wisner v. Professional Divers of New Orleans, 98-1755 (La.3/2/99), 731 So.2d 200, petition for cert. filed, 98-1908 (5/27/99), 67 USLW 3749, the Louisiana Supreme Court confirmed that to prove seaman status, it must be shown that a significant part of the seaman's work is performed aboard the vessel with some degree of regularity and continuity. It also reaffirmed that to meet the second prong of the seaman status test, the person must be doing the ship's work. Importantly, the court recapitulated the finding of the United States Supreme Court that, "one should focus upon the essence of what it means to be a seaman rather than allowing jurisprudential `tests' to obscure such a finding." Id. at 204.
Thus, the cases dictate that when we determine if Mr. Burgess's connection to the PROTEUS is substantial, we ultimately focus on whether his duties were primarily sea-based activities. The evidence presented at trial proves that Mr. Burgess was initially hired as a leverman by Bean, but was promoted to a captain before terminating his employment. A leverman is the person who operates the dredge and supervises the crew. However, the PROTEUS was not fully operational at the time of the accident, rather, Mr. Burgess and his co-workers were preparing the dredge to set sail. In fact, the pipe that Mr. Burgess was unloading when he was injured was to be used aboard the PROTEUS during its mission. Considering that the evidence sufficiently establishes that Mr. Burgess was working *260 aboard the PROTEUS and in the Bean yard to prepare the PROTEUS for its mission to Raccoon Island, we find that the Mr. Burgess was contributing to the function of the vessel and to the accomplishment of its mission. Indeed, defendant concedes this point, and also concedes that the PROTEUS was a "vessel in navigation."
As for the second prong, Bean argues that Mr. Burgess had two separate and distinct periods of employment with Bean. Bean avers that because there was clearly a "reassignment of essential duties," Mr. Burgess was not yet a seaman at the time of the accident. First, he worked to prepare the PROTEUS in the Bean yard, then he performed his duties aboard the PROTEUS. Bean argues that since Mr. Burgess was injured during the land-based assignment, we must only consider this time period while examining for seaman status, and, thus, the second prong is not satisfied. We find this argument unpersuasive; the record is completely devoid of any evidence suggesting that Mr. Burgess was "reassigned" to sea-based duty. Rather, we find that Mr. Burgess was hired to help finish preparing the PROTEUS and then to perform sea-based duties aboard the PROTEUS; at no point did Mr. Burgess or Bean ever anticipate that Mr. Burgess would not be the dredge's leverman once it was prepared. This belief is substantially evidenced by the fact that Mr. Burgess was specifically hired to be the PROTEUS's leverman and the evidence at trial confirms that he was indeed working as a leverman and then as a captain aboard the PROTEUS. In fact, the period of land-based employment comprised only two months of Mr. Burgess's eight months of employment with Bean.
Thus, as to the second prong, we find that Mr. Burgess has a connection to the PROTEUS that is substantial in both its duration and its nature. The testimony at trial establishes that Mr. Burgess was hired to complete preparatory work of the PROTEUS and then aid in navigating the dredge to its destination, Raccoon Island. Once there, Mr. Burgess worked exclusively aboard the dredge. At the time of the accident, Mr. Burgess was preparing the dredge; he was unloading pipe to be used on the PROTEUS. Also, once the PROTEUS was prepared, Mr. Burgess worked as both a leverman and a captain. These jobs clearly demonstrate that the nature of Mr. Burgess's work was substantially connected to the vessel. Finally, regarding duration, while Mr. Burgess did not work for Bean for an extended period of time prior to the accident, all of the time he was employed by Bean he was substantially connected to the PROTEUS. His work with the PROTEUS was not sporadic or transitory. Indeed, the testimony establishes that Mr. Burgess spent the majority of his time with Bean aboard the dredge. As noted above, the determination of seaman status is done on a case-by-case basis, each case turning on its own individual facts. Although Mr. Burgess was employed by Bean for only a brief period of time before his injury and less than a year post-injury, the spirit of the Jones Act clearly envisions a person of his status to be a Jones Act seaman. We hold that Mr. Burgess was a Jones Act seaman at the time of his injury.

BEAN'S ASSIGNMENT OF ERROR TWO:
Bean argues in this assignment that Mr. Burgess is not entitled to an award for maintenance and cure because he is not a seaman.
"Maintenance and cure" is an ancient duty imposed upon the owner of a ship to provide food, lodging and necessary medical services to seamen who become ill or injured during service to the ship. Davis v. Odeco, Inc., 18 F.3d 1237, 1245 (5th Cir.1994), cert. denied, Murphy Exploration & Production Co. v. Davis, 513 U.S. 819, 115 S.Ct. 78, 130 L.Ed.2d 32 (1994). The burden of proof in seeking maintenance and cure is relatively light because recovery is not contingent upon *261 the negligence of the vessel or its owner. Generally, a seaman need only prove that the injury arose during his service of the vessel; no causal connection to his duties need be shown. Comeaux v. Basin Marine, Inc., 93-1624 (La.App. 1 Cir. 6/24/94); 640 So.2d 833, 836, writ denied, 94-2307 (La.11/18/94); 646 So.2d 386. Again, defendant's argument rests solely on the belief that Mr. Burgess is not a seaman. However, because we have already determined that Mr. Burgess is a seaman for Jones Act purposes, we find that he is entitled to maintenance and cure. Theriot v. McDermott Inc., 611 So.2d 129, (La. App. 1 Cir.1992), writ denied, 615 So.2d 342 (La.1993).

BEAN'S THIRD, FOURTH AND FIFTH ASSIGNMENTS OF ERROR:
First, the defendant argues that the trial court erred when it applied the wrong standard of care to determine liability under the Jones Act. Specifically, Bean alleges that the trial court applied the erroneous, "slight negligence" standard, rather than the recently adopted, "ordinary negligence" standard.
The standard for Jones Act negligence used to be, "feather light and only the slightest degree of negligence is sufficient to impose liability on an employer." Mistich v. Pipelines, Inc., 609 So.2d 921 (La.App. 4 Cir.1992), writ denied, 613 So.2d 996 (La.1993) cert. denied, Brown & Root, Inc. v. Mistich, 509 U.S. 913, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993). But, the Louisiana Supreme Court recently adopted the requirements for finding negligence under the Jones Act as enunciated in the United States Fifth Circuit opinion, Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997). It stated in Foster v. Destin Trading Corp., on rehearing, 96-0803 (La.10/21/97), 700 So.2d 199, "The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances." Id. at 208, citing, Gautreaux, supra. However, a sea-man need only prove causation between the breach of the employer's duty and the injuries sustained by "slight evidence."
Defendant points to the trial court's reasons for judgment to support its argument that the incorrect standard was used. The trial court stated,
There was more than an occupance [sic]of slight negligence on the part of the defendant. The Court finds that the totality of the circumstances that encompassed the pipe unloading operation was the proximate cause of the accident that caused plaintiff's injuries and constituted sufficient negligence on the part of the defendant to trigger liability under the Jones Act.
Defendant argues that the use of the term, "slight negligence" infers that the trial court made its determinations based on the "slight negligence" standard, thus prompting this court to conduct a de novo review. We agree with the defendant and, therefore, conduct a de novo review. Crawford v. Falcon Drilling Co., Inc., 131 F.3d 1120 (5th Cir.1997); Viator v. Liverpool & London S.S. Protection and Indem. Ass'n, 97-264 (La.App. 3 Cir. 10/8/97), 701 So.2d 487, 490-491, writ denied, 98-0027 (La.3/13/98), 712 So.2d 880.
Using the ordinary negligence standard, we find that Bean breached its duty of ordinary care to Mr. Burgess. Bean had a duty to provide Mr. Burgess with a safe work environment. However, the record indicates that this duty was not met. At the time of the accident, only three people were unloading the pipe off of the truck. The testimony establishes that more than three people should have been unloading the pipes. Also, the testimony unequivocally establishes that the Bean yard is not equipped with artificial lighting, thus when the unloading process began at dusk, it was difficult for the men to clearly see what they were doing. The testimony established that a flagman was not being used; had a flagman been used, he could have signaled to the crane operator *262 that the pipe was too low or that Mr. Burgess was momentarily diverted. Also, it is undisputed that Mr. Derbes, the crane operator, could not see the entire area where he was unloading the pipe. The pipes were fifty feet long, and at least ten feet of the pipes was out of Mr. Derbes field of vision. He was essentially swinging fifty-foot pipes, unable to see where they were landing. Taken together, these factors clearly demonstrate that Bean breached its duty of ordinary care; it did not exercise ordinary care under the circumstances and was negligent for unloading the pipes in this manner.
Next, the defendant argues that even if it was negligent, such negligence did not cause Mr. Burgess's accident. The Jones Act still contains a liberal causation requirement; this standard has not been changed. A seaman is entitled to recover if the employer's negligence played any part, even the slightest, in producing his injury. Foster, 700 So.2d at 208; Miller v. International Diving and Consulting Services, Inc., 95-873 (La.App. 5 Cir. 2/14/96), 669 So.2d 1246, 1254. Based on the record before this Court, we find that Mr. Burgess has adequately proved causation. The pipe unloading operation was conducted negligently, and this negligence caused him to be struck by a 50-foot pipe and thrown off of the pile of pipes. He landed on his left shoulder and side, sustaining injury.
The defendant also argues that the record clearly demonstrates comparative fault on Mr. Burgess's part, if not, in the alternative, that Mr. Burgess's behavior was the sole cause of the accident. Specifically, the argument is that Mr. Burgess solely caused this accident because he admittedly was not paying attention at the exact moment that the pipe was being swung toward him. Under the Jones Act, contributory negligence, however gross, does not bar recovery, but only mitigates damages. Capiello, 695 So.2d at 1102. Indeed, an employer can introduce evidence of a seaman's own negligence to reduce damages through application of comparative fault principles. Foster, 700 So.2d at 208. However, in this case, we do not find that Mr. Burgess was even comparatively negligent, let alone solely at fault. The pipes were being unloaded without enough manpower, yet, Mr. Fail, plaintiff's supervisor, allowed it to continue. The crane operator admittedly could not see ten feet of the pipe that he was swinging toward Mr. Burgess. There was no artificial lighting in the Bean yard, yet, the pipes were being unloaded at dusk. Also, between the crane and the pile of pipes, there were very large containers being used as offices, but, there was no flagman to insure that the pipe was being directed properly. The fact that Mr. Burgess admits he was momentarily distracted is of no moment. The fault of the defendant is overwhelming, considering the circumstances. Although Mr. Burgess took a brief moment to look away and ask his supervisor a question, we do not find that this constitutes comparative fault on his part.

BEAN'S SIXTH ASSIGNMENT OF ERROR; BURGESS'S ASSIGNMENTS OF ERROR:
These assignments of error all address the quantum of damages. Bean argues that there is no objective medical evidence to support a finding that Mr. Burgess suffered a permanent injury precluding him from returning to his former employment or from earning equal or greater wages in the future. Mr. Burgess argues that the award for past and future physical and mental pain and suffering; the award for past wage loss; and the award for loss of earning capacity should be increased.

General Damages:
Both Bean and Mr. Burgess contest the $100,000 award for past and future physical and mental pain and suffering. Bean believes that Mr. Burgess was unable to present any objective evidence of his pain. However, Dr. Gambrell testified *263 that when he performed an EMG, he found one area that was positive. While he admitted that this is a minimal finding, it is still an objective finding. Also, Dr. Hurayt testified directly that he did not believe Mr. Burgess was malingering, and none of the other doctors suggested that Mr. Burgess was malingering. Dr. Shobe testified to grinding of the shoulder upon palpation and recommended an arthroscope. Also, Dr. King believed the defendant was suffering from left shoulder impingement. Moreover, all of the doctors believed that Mr. Burgess suffered from degenerative disk disease and all of them opined that this disease could remain asymptomatic but become symptomatic due to trauma. Dr. Gold assigned Mr. Burgess a 5% disability rating, but admitted that this figure did not consider pain and Dr. King assigned him a 10% disability rating. Also, Dr. Gambrell and Dr. Huyart both opined that plaintiff is permanently disabled.
The medical testimony in this case is extensive. Thus, the trial court clearly had to discern the nature of Mr. Burgess's injury and the extent to which Mr. Burgess was disabled, if at all disabled by comparing and contrasting the deposition testimony. Ultimately, the trial court concluded that plaintiff suffered a painful and permanent injury.
The trial court is afforded much discretion in granting damage awards, and this extends to special damages. Parks v. Pine Bluff Sand & Gravel Co., 97-682 (La.App. 3 Cir. 2/18/98), 712 So.2d 905, 912; Dehart v. Ferruzzi U.S.A., Inc., 95-0653 (La.App. 4 Cir. 10/12/95),663 So.2d 466, 469; Sinor v. National Cas. Co., 633 So.2d 720, 722 (La.App. 1 Cir.1993). The trial court has great discretion is assessing damages, and the trial court's finding in this regard will not be disturbed on appeal in the absence of clear abuse of discretion. La.C.C. art. 2324.1. Based on the record, we do not find that the trial court abused its vast discretion when it awarded Mr. Burgess $100,000 in general damages. We find no merit to these arguments.

Future wage loss:
Again, Bean argues the trial court's award for future wage loss is excessive while Mr. Burgess argues this award was inadequate. Bean argues that Mr. Burgess is completely capable of returning to work as a dredge leverman or captain, earning equal or better wages than he earned with Bean. Therefore, defendant's argue that the trial court erred when it did not consider the testimony of Jennifer Palmer, who believed plaintiff could easily be re-employed as a dredge captain or leverman. Mr. Burgess argues that he is totally disabled and cannot return to work. Again, the trial court determined that Mr. Burgess had suffered a painful and permanent injury, but it did not determine that he was totally disabled and unable to return to some type of employment.
The trial court awarded Mr. Burgess $163,319.27 for loss of future earning capacity. Introduced into evidence were economic reports as pertains to Mr. Burgess's loss of future income. Kenneth J. Boudreaux prepared a report for the defense, and Melville Z. Wolfson prepared a report for the plaintiff. According to Dr. Wolfson, assuming that Mr. Burgess is totally disabled, his estimated loss from the date of trial until retirement age, which was based on Mr. Burgess working sixteen more years, is $535,530.00, after taxes. Dr. Boudreaux presented two different reports. One was based on a pretax annual income of $41,163.46, and the other was based on a pretax annual income of $32,850.12. The $41,163.46 sum is based on an average of his 1993 and 1994 income. The $32,850.12 income figure is based on an average of his 1991, 1993, and 1994 income. Then, within these two income differentials, he determined Mr. Burgess's loss of income based on total disability, net minimum wage, net of 50% capacity, and net of $15.00 per hour. The award of $163,319.27 was a figure taken directly from Dr. Boudreaux's report. This figure is based on a pretax annual income base of $32,850.12, with a net of *264 50% capacity. Again, at trial, there was some question regarding whether or not Mr. Burgess had been or could work as a shrimper. The evidence was conclusive that he did purchase a shrimping boat and did attempt to take it, at least sporadically, out to sea. The trial judge chose to accept the testimony of defendant's expert and reject that of plaintiff's expert regarding the amount of future loss wages. Moreover, the trial court chose not to accept the testimony of Jennifer Palmer, that he could easily earn equal or greater wages. Based on our review, we find no clear error in that determination. See, Walton v. Cooper/T. Smith Stevedoring, 97-0100 (La.App. 4 Cir. 3/4/98), 709 So.2d 941.

Past wages:
Mr. Burgess believes that the trial court erred when it awarded him only $32,850.12 in past wage loss. The economic report of Dr. Wolfson estimated Mr. Burgess's pretax past wage loss to be $152,932.00. He arrived at this amount by multiplying the after tax base of $47,850.00 by the period of time which elapsed between September 14, 1993 and October 27, 1997.[1] He did not consider any other income that Mr. Burgess may have earned during the evaluated time period. Dr. Boudreaux determined past wage loss to be $65,178.02, based on a pretax annual income of $32,850.12; and $93,133.50, based on a pretax annual income of $41,163.46. He used the date of October 24, 1994 to begin calculating past lost wages through the date of trial, October 27, 1997. Again, these figures were based on an assumption that Mr. Burgess had no income during this time period. However, the evidence at trial did not conclusively prove that Mr. Burgess had no income during this time period.
The trial testimony established that Mr. Burgess continued to work for Bean well into 1994, earning $30,493.00. Mr. Burgess claims that he has not worked since. However, the evidence presented at trial proves that he purchased a commercial shrimping boat. At trial, the court was presented with testimony from Mr. Burgess and his wife regarding the frequency with which they were able to go shrimping. A tax return for 1995 was never presented at trial and the Burgess's 1996 tax return showed a loss of $9,605. This loss was from expenses exceeding revenue generated from shrimping. Mrs. Burgess testified that much of these expenses consisted of depreciation taken on the boat. Thus, it was the judge's prerogative to determine whether or not he believed this testimony and whether or not he believed that Mr. Burgess did not have any income from shrimping or other sources in the time lapse between leaving Bean and trial. Therefore, we cannot say that the trial court was manifestly erroneous in awarding Mr. Burgess $32,850.12 for past wage loss.

CONCLUSION:
For the foregoing reasons, after conducting a de novo review of the liability issues, we affirm the decision of the trial court.
AFFIRMED.
NOTES
[1] This figure is clearly excessive considering that Mr. Burgess continued to work for Bean in 1994 and earned over $30,000 that year.