725 So.2d 474 (1999)
Joseph VENDETTO
v.
SONAT OFFSHORE DRILLING CO.
No. 97-C-3103
Supreme Court of Louisiana.
January 20, 1999.
*475 Timothy John Falcon, Stephen Michael Wiles, Mack E. Barham, Robert Elton Arceneaux, Barham & Arceneaux, New Orleans, Gail N. Wise, Travis L. Bourgeous, New Orleans, Counsel for Applicant.
Harry Alston Johnson, III, Shreveport, Phelps Dunbar, Timothy W. Cerniglia, Homer; Stephenson, Matthews & Chararri, New Orleans; Counsel for Respondent.
LEMMON, Justice.[*]
This is an action to recover damages for personal injuries incurred by a seaman aboard a ship. Plaintiff seeks recovery under the Jones Act, based on the negligence of plaintiff's employer, and under the general maritime law, based on the unseaworthiness of defendant's vessel. The principal issue is the correctness of the holdings by the court of appeal that plaintiff failed to prove Jones Act negligence and that the trial court's finding of unseaworthiness was manifestly erroneous.
Facts
Plaintiff worked for six years for defendant drilling company as a seaman aboard the DISCOVERER 534, a drilling vessel owned and operated by defendant. He had previously worked for another employer for two years in a job that also required lifting and carrying of heavy objects.
On January 19, 1993, plaintiff, while working as a mechanic[1] on the DISCOVERER 534, was called up to assist with a Sonat automated maintenance (SAM) procedure.[2] While plaintiff had assisted in two or three SAMs previously, this was the first time he was required to perform the task in any capacity other than as a helper.
Performance of the SAM required the lowering of tools and chain falls, weighing thirty to forty pounds, down into the thruster tunnel, a distance of about thirty feet. According to plaintiff, he learned the procedure by *476 watching and assisting others in previous SAMs. While plaintiff did not recall whether his supervisors, John Kelly and Charles Brokaw, had discussed lifting techniques with him before starting the SAM in which he allegedly was injured, other employees verified that there was a planning meeting, attended by plaintiff, before the procedure was begun.
At the beginning of the SAM, other seamen put down a scaffolding. Using the procedure he had seen fellow workers and supervisors use, plaintiff lowered the tools and chain falls with a rope, hand over hand, over the rail of the A-frame to Eugene Orcutt, who was in the tunnel below. When he was lowering a chain fall, he felt a pain in his neck, but continued working. When his soreness recurred during work the next day, he reported the injury to the medical person on board. Two days later, plaintiff was referred to a doctor, who initially diagnosed muscle strain, but eventually determined that plaintiff had sustained a ruptured disc which required surgery.[3]
This tort action ensued, asserting two theories of recovery: (1) the negligence of defendant in failing to provide proper training in safe methods of lifting and lowering tools, and in failing to ensure that supervisory personnel required employees to utilize safe and proper procedures in performing the SAM; and (2) the unseaworthiness of the vessel arising from the dangers of having an improperly trained and supervised crew.
At trial, plaintiff testified that he had seen and used a "wrap around" as a safe method for lowering tools, but that wraps generally were used only for lowering heavier objects and that there was not enough room to use wraps without getting hung up on obstructions on the tunnel wall. Plaintiff asserted that he was required to swing the chain fall over into the thruster with a rope, away from the side of the thruster, as opposed to lowering it down straight. He admitted, however, that there was a place at the handrail where one could lower tools without having to worry about obstructions and that he had lowered tools from that spot before, but on the day of the accident he used a spot where he had to pick up the tools to avoid obstructions. Plaintiff complained that defendant should have provided mechanical equipment to assist in lowering tools.
Kelly, the mechanical supervisor, testified that in addition to the planning meeting before beginning the SAM, which plaintiff attended, safe lifting techniques were frequently discussed at weekly safety meetings. Other evidence established that placards illustrating proper lifting techniques were posted at various places around the ship.
Brokaw, another supervisor, verified the pre-SAM meeting, at which they discussed the SAM procedure, but stated he was not involved in beginning the operation. He testified that the seamen generally used regular rope to lower tools by the hand-over-hand method until the person in the tunnel (who cannot be seen) reaches out and grabs the tool. He never felt the need to use safety wraps in such operations.
The rig safety technician testified that lowering and raising tools thirty feet should be discussed at the pre-task safety meeting, and that there were regular classes and videotapes on back safety and proper lifting techniques.
Orcutt, plaintiff's co-employee, also verified the pre-task meeting on the morning of the SAM.
A materials handling safety expert presented by defendant testified that manually lowering tools weighing forty to fifty pounds about twenty-five feet with a rope was a safe and acceptable procedure if proper techniques were used. He approved the lifting procedures and on-the-job safety programs used by defendant.
An expert in drilling rig operations and safety presented by plaintiff admitted that lowering tools with a rope can be done effectively and safely "without being negligent." However, he criticized defendant for abandoning, because of excessive loss of tools, *477 previously-used mechanical means of lowering tools, noting that mechanical assistance is designed to avoid injury, not to avoid losing tools.
Following a two-day bench trial, the trial court ruled in plaintiff's favor on both theories, awarding a total of $1,048,768 in damages. As to unseaworthiness, the court found the vessel had an improperly trained and supervised crew, and that defendant's failure to ensure that the supervisors on board were following and enforcing proper safety methods resulted in a "condition that made the vessel unseaworthy." The court concluded that the vessel was not reasonably fit for its intended use, because the personnel did not know how to perform their jobs in a safe manner.
As to Jones Act negligence, the trial court noted that the standard of care for negligence is the failing to exercise the care which an ordinary prudent person would use under the circumstances, and that the standard of causation is whether the defendant's negligence played any part, even the slightest, in producing the injury. The court ruled that defendant negligently failed to provide a reasonably safe workplace based on virtually the same factors referred to in the unseaworthiness determination, namely defendant's "failure to provide a safe work place by not ensuring that proper safety methods were being enforced by the supervisors on board" and "failure to make sure the crew members were properly supervised." The court observed that plaintiff was not properly trained in the safe method of lowering and lifting tools, but simply followed the example of those he watched and assisted, and that the supervisors never corrected the use of unsafe methods. However, the court did not articulate how the method used by plaintiff and his co-employees to lift and lower tools was unsafe.
Finally, in finding no contributory negligence, the trial court, citing Spinks v. Chevron Oil Co., 507 F.2d 216 (5th Cir.1975), noted that a seaman's duty to protect himself is slight, especially when the supervisor knows the method used by the seaman and does nothing about it.
In the interim between the trial court's judgment and the court of appeal's review of the case, the federal court of appeals in Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997), overruled Spinks and several other cases which had used loose language such as "slight negligence" in describing the standard of care in Jones Act negligence cases. The court in Gautreaux held that a Jones Act seaman is required to act as a reasonable seaman under like circumstances, and that a Jones Act employer is required to act as a reasonable employer under like circumstances.
On appeal in the present case, the court of appeal noted that Gautreaux had overruled the Spinks case relied upon by the trial court in the contributory negligence analysis. 96-0626 (La.App. 1 Cir. 9/23/97); 701 So.2d 243. Applying Gautreaux, the intermediate court reviewed the facts under the standard of care stated therein.
The intermediate court, characterizing the task plaintiff was assigned to perform as "a common, ordinary task" that he had done "many times before," held that although other methods of lowering the tools were available, the method selected was not "unsafe." Further emphasizing that plaintiff had selected the method for lowering the tools from among several methods known and available to him, the court concluded that Jones Act negligence on defendant's part was not proved.
As to the unseaworthiness of the vessel, the court of appeal held that the trial court's findings that plaintiff "was not properly trained in lifting and that this lack of training made the vessel unseaworthy" were manifestly erroneous. 96-0626 at p. 7 (La.App. 1 Cir. 9/23/97); 701 So.2d 243, 248.
We granted certiorari to address the correctness of that decision. 97-3103 (La.3/20/98); 715 So.2d 1194.
Negligence Standard of Care in Jones Act Cases
The Jones Act provides the same rights to seamen that are provided to railway employees under the Federal Employers Liability Act (FELA), which in pertinent part makes the employer liable for injury "resulting in *478 whole or in part" from the negligence of the employer's officers, agents or employees. 45 U.S.C. § 51 (1982). While the language of FELA suggests a reduced standard of causation, nothing in FELA or the Jones Act suggests a variation from the ordinary standard of care used in evaluating negligence in ordinary tort cases, namely, reasonable care under the circumstances.
In Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), the Court used the FELA language to articulate the test whether the employer's negligence played any part, even the slightest, in producing the injury. See Rogers v. Missouri Pac. R. Co., 352 U.S. 521, 77 S.Ct. 459, 1 L.Ed.2d 515 (1957), which used similar language in a Jones Act case. Moreover, in Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946), the Court earlier had indicated a less stringent evidentiary threshold for the trial judge to submit the employer's negligence question to the jury or to sustain a jury verdict in Jones Act and FELA cases.
Despite the lack of any statutory basis, the term "slight" crept into decisions of the lower federal courts on issues other than the causation prong of the liability determination. In regard to the negligence of the Jones Act or FELA employer, see, e.g., Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969)(en banc)(slight negligence means the failure to exercise great care, implying a higher standard of care for Jones Act employers than other tortfeasors); and in regard to the contributory negligence of the seaman, see, e.g. Spinks v. Chevron Oil Co., supra (while the Jones Act employer's breach of the standard of care is based on the "slightest negligence," the seaman has only a slight duty to protect himself). Some decisions even characterized the seaman's burden of proof of the employer's fault as "featherweight." See, e.g., Bommarito v. Penrod Drilling Corp., 929 F.2d 186,188 (5th Cir.1991).
The loose language of decisions implying a higher standard of care on Jones Act employers has been extensively criticized. See Robert Force, Allocation of Risk and Standard of Care under the Jones Act: "Slight Negligence," "Slight Care?" 25 J.Mar.L. & Com. 1 (1994); Brian J. Miles, The Standard of Care in a Seaman's Personal Injury ActionHas the Jones Act Been Slighted?, 13 Tul.Mar. L.J. 79 (1988). The federal Fifth Circuit finally confronted the issue en banc in Gautreaux, which as noted earlier was decided after the trial court judgment in the present case.
In Gautreaux, the plaintiff, a relief captain on a push boat, had been instructed by the permanent captain that a manual crank handle could be used to override the electric switch on the winch if it failed, but had not been told to remove the handle on the winch motor when attempting to engage the winch by use of the electric switch. When the plaintiff used the crank handle to override the electric switch and turned the handle while simultaneously pressing the switch, the handle flew off and struck the plaintiff. In the ensuing trial, the judge instructed the jury that seamen were bound only to a duty of slight care for their own safety, and the jury apportioned ninety-five percent fault to the employer and five percent fault to the seaman.
The court of appeal, after surveying the far-ranging earlier opinions of that court on the issue, held that the FELA and the Jones Act do not distinguish between degrees of negligence and that the standard of care, both for Jones Act employers and for Jones Act seamen, is to act as an ordinarily prudent person would act under similar circumstances. Pointing out that the circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but on his own experience, training and education, the court concluded that the reasonable person standard in a Jones Act negligence action is that "of the reasonable seaman in like circumstances." 107 F.3d at 339 (emphasis in original). See also Ronald K. Schuster, Standard of Care in Jones Act Negligence CasesFrom Slight to Ordinary Care: Gautreaux v. Scurlock Marine Inc., 22 Tul.Mar.L.J. 315 (1997).
Though not bound by the Fifth Circuit's decision, we agree with the holding and *479 the reasoning.[4] In a Jones Act case, the court should determine the negligence of the employer according to the standard of a reasonable employer under like circumstances, and should determine the contributory negligence of the seaman according to the standard of a reasonable seaman under like circumstances. Foster v. Destin Trading Co., supra.
Nevertheless, since the duty to provide a safe place to work allocates substantial risks of maritime employment to the employer, identical conduct is not demanded of the employer and the employee. Force, supra at 3, 19. The law allocates different risks to different parties, and that allocation forms parts of the reasonableness equation in the negligence determination. A defendant's standard of care, like that of the plaintiff, varies according to the conduct in which the party is engaged. Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law § 39-2 (1996). See also Argus v. Scheppegrell, 472 So.2d 573 (La.1985)(when a doctor prescribed large amounts of drugs to a young patient known by the doctor to be a drug addict, the doctor was in a greatly superior position to avoid the risk of the patient's death from a drug overdose, and was not allowed to defeat recovery, under the then rule of contributory negligence, by pleading the exact conduct by the patient that was the risk prompting imposition of the duty on the doctor not to prescribe large amounts of drugs). The determination of who had the duty to eliminate or minimize the risks of an injury-causing hazard is central to the negligence inquiry. The duty on the employer to make the work place safe may, in a sense, impose a greater duty on the employer than the duty on the seaman to use reasonable care for his own safety. See Force, supra at 19. But irrespective of the duty imposed, the standard of care on both an employer and a seaman is that of a reasonable person in the same position under like circumstances.

Jones Act Negligence in the Present Case
While the parties argue over the impact on the present appeal of the intervening Gautreaux decision, the critical issue is whether plaintiff established that the method used in the SAM was unsafe for lowering and lifting tools. Absent a showing that the method utilized by plaintiff was unsafe, there can be no finding of negligence by the defendant on which to hinge an imposition of liability under the Jones Act.
Implicit in the trial court's judgment in plaintiff's favor was a finding that the method used by plaintiff was unsafe. However, the record simply does not support a finding that this method of lowering and lifting a chain fall weighing thirty to forty pounds was unsafe.
The trial court agreed that tools and chain falls could be safely lowered with a rope. The evidence suggested three ways that can be used to lower tools on a rope: hand-over-hand, the wrap method (putting a wrap of the rope around a handrail to shift most of the weight to the rail), and simply playing out the rope over the handrail. None of these methods was shown to be unsafe. Nor was there any evidence that the method plaintiff selected to usehand-over-hand presented an unreasonable risk of harm.
The expert in drilling operations and safety presented by plaintiff simply testified that if plaintiff lowered tools manually from Location No. 1 while leaning over the handrail, it would "put stress on a man's back," and, in response to a question whether this manner of doing the task was inappropriate, the expert answered that "I think it puts more strain on the back than onethan alternative methods" such as mechanical means. The expert thus opined not that the method was unsafe or posed an unreasonable risk of injury, but that it puts stress on the plaintiff's back "analogous to lifting heavy stuff out of a trunk of a car," a common task performed every day by ordinary people without incident.
*480 All the experts agreed the hazard, if any, was an ordinary one recognized by ordinary workers. The expert presented by plaintiff stated that use of a rope was not unsafe and was not negligent. Here, the risk of harm from lowering an object weighing only thirty to forty pounds is relatively minor, and this is a routine task commonly encountered by shipboard workers.
Both the trial and appellate courts agreed that defendant was not at fault for failing to provide a mechanical means for performing the task. Factually, the trial court agreed with defendant that "mechanical means were not necessary and that there are safe means of manually lowering and lifting tools." Legally, the court of appeal found this case analogous to Rogers v. Eagle Offshore Drilling Services, Inc., 770 F.2d 549 (5th Cir. 1985), in which the court held that while a mechanical means of doing the task was preferable, the failure to use an available mechanical means did not render the manual means of doing the job unsafe, given the lack of evidence the manual method itself was unsafe. "The failure to use an available method to accomplish the same work does not render a given method of performing the work unsafe." 770 F.2d at 550.
Furthermore, mere failure to instruct and supervise does not equate to Jones Act negligence when the seaman is fully knowledgeable of the available safe method. See, e.g., Grover v. American President Lines, Inc., 1995 A.M.C. 2105, 1995 WL 510329 (N.D.Cal.1995). In Grover, the seaman's assigned task was connecting electrical cords for refrigeration units used to store cargo on deck. While attempting to reach a plug outside of his arm's reach (and admitting that he first considered getting a ladder), the seaman climbed on a rail and injured himself. Rejecting the seaman's argument that the employer was negligent in failing to properly instruct him in the proper procedures for plugging in electrical cables, the court noted testimony establishing it was "common knowledge among experienced seamen that sailors should use ladders instead of climbing because men `are not monkeys.'" Id. at 2108, 1995 WL 510329. Further observing that plaintiff was an experienced seaman and never denied knowing this "common knowledge safety tip," the court held that plaintiff failed to prove his employer was negligent in failing to remind him of what "he already knew or should have known." Id. at 2108, 1995 WL 510329. The court further reasoned that "plaintiff never testified that his decision not to seek or use a ladder would have been different had he been specifically instructed at some time prior to the accident that he should use a ladder. That is, there is no evidence that the absence of instructions on ladder use was even a cause, however slight, of his injury." Id. at 2108, 1995 WL 510329 (emphasis in original). See also Robinson v. Zapata Corp., 664 F.2d 45, 48 (5th Cir.1981)(holding that "[d]efendant could not have been negligent in failing to properly supervise or train an employee in off-shore welding when that employee clearly stated that he had two years experience in off-shore welding.")
Similar to the situations presented in Grover and Robinson, plaintiff failed in this case to present any evidence to support a finding that defendant's failure to instruct him on proper lifting and lowering procedures, of which he admitted he had knowledge, was even a cause, however slight, of his injury. Plaintiff admitted he knew all three methods of manually lifting and lowering with a rope, and that he elected to do the task hand-over-hand. Moreover, plaintiff's supervisor, Kelly, testified in his deposition that the reason he did not instruct on safe lifting in the pre-task meeting was that "[i]t's common knowledge to throw your wrap around the pole right there" and that "[i]t's common sense" and not a matter requiring any special training.
The trial court's judgment in plaintiff's favor on the negligence claim was based on defendant's failure to adequately instruct, train and supervise him in safe lifting and lowering tools for a SAM. The trial court recognized that plaintiff had substantial training and experience, yet concluded that "the supervisors on board the DISCOVERER 534 were not making sure that proper safety methods were being used on the rig. It is clear that Vendetto was not properly trained in the safe method of lowering and *481 lifting tools." The evidence, however, established that plaintiff was trained to use, and had actually used, safe methods of lifting and lowering tools. Plaintiff testified that he was trained in safe lifting principles. He had eight years experience working offshore performing these types of elementary tasks. He viewed videotapes on safe lifting, attended safety meetings on a regular basis at which safe lifting basics were addressed, and observed safety placards posted on the vessel. Before the accident, plaintiff had observed others lower tools, had used the wrap method and knew it was a safe method, and had lowered tools and equipment on a rope for work on this particular thruster. All of the supervisors testified that they had not observed plaintiff using an unsafe method of lifting or lowering tools and that he was competent and trained.
The trial court's focus on the testimony of the expert on drilling rig operations and safety that plaintiff was "in training," which was noted on one of plaintiff's evaluation reports, was misplaced. Plaintiff was not in training to learn the basic task of lifting and lowering tools; he was in training to learn how to do backlash readings, variable readings, and measurements with dial indicators, and to properly record such readings. These higher level skills were the type of things for which plaintiff needed additional training, and not the basic level skill of lifting and lowering.
The absence of a written report of a pre-task meeting was another factor emphasized by the expert. The witnesses, save for plaintiff who could not recall, all testified that there was a pre-task meeting at which Kelly drew out what needed to be done. Kelly went over the procedures, what tools were needed, and discussed safety concerns such as oil leaks and hazards of falling. Orcutt and plaintiff then met and discussed between them who would do what aspects of the job. Defense witnesses, including Kelly, testified that it was unnecessary to discuss safe lifting at every pre-task meeting because plaintiff already knew them, having attended safety seminars, watched videotapes on the subject, and been trained in safe lifting techniques.
Moreover, the lack of instruction or supervision was not a cause of the accident. Plaintiff failed to show that he would have done anything differently if he had been instructed further or provided with additional supervision. Indeed, plaintiff testified his supervisors had previously seen him do everything he did on the day of the accident and had never seen fit to correct him. The trial court's reliance on these factors to impose liability on defendant was incorrect, inasmuch as any lack of instruction or supervision was simply not a cause-in-fact of plaintiff's injury.

Unseaworthiness
An owner of a vessel has an absolute duty to furnish a seaworthy vessel, and a breach of that duty gives rise to a claim for general damages. To state a cause of action for unseaworthiness, the plaintiff must allege an injury "caused by a defective condition of the ship, its equipment or appurtenances.... Members of the crew of a vessel are also warranted as seaworthy, and there may be liability for ... negligent orders, or for utilizing an understaffed or ill-trained crew." 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-25, at 333-34 (2d Ed.1994). Whether a vessel is unseaworthy is a factual question to be decided on a case-by-case basis. Id.
An isolated act of operational negligence will not suffice to create an unseaworthy condition; rather, operational negligence must be "pervasive" or repeated frequently for it to rise to the level of an unseaworthy condition as in an "improper method of operation." Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 498, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971); Robinson v. Showa Kaiun K.K., 451 F.2d 688 (5th Cir.1971)(distinguishing "isolated" negligent acts from congeries of negligent acts that can create a condition connected to the status of the vessel).
Although the duty of seaworthiness is absolute and does not require negligence, the mere fact an accident occurred does not establish unseaworthiness. The plaintiff bears the burden of proving that "the unseaworthy condition played a substantial *482 part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Foster v. Destin Trading Corp., 96-803, p. 7 (La.10/21/97); 700 So.2d 199, 209 (on reh'g)(quoting Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354 (5th Cir.1988)).
The basis for the trial court's finding of unseaworthiness in the present case was defendant's failure to train, instruct or supervise its employees. Such conduct can amount to an unseaworthy condition if it is pervasive and repeated frequently. See Brown v. Cliff's Drilling Co., 638 F.Supp. 1009 (E.D.Tex.1986)( the employer provided no instruction or training of any kind, held no safety meetings until after accidents occurred, provided no supervision and simply "assumed people knew what to do"). Here, however, defendant provided instructions to plaintiff on safe lifting at weekly safety meetings and in other forms such as safe lifting video tapes (which plaintiff viewed) and placards posted around the vessel (which plaintiff acknowledged seeing). A pre-task meeting was held at which the means of performing the SAM were discussed (although safe lifting was not expressly addressed). Further, plaintiff was supervised. While two of plaintiff's supervisors (Kelly and Brokaw) were engaged in another operation at the same time the SAM was being performed, plaintiff was not left to do the task alone; a higher level mechanic, Orcutt, was working with him. Indeed, the trial court noted in its factual findings that Orcutt was in a supervisory position over plaintiff, and Orcutt worked with plaintiff for the entire SAM. Given this record, the court of appeal correctly concluded that the trial court's factual findings were inconsistent with its finding of unseaworthiness and held that such finding was manifestly erroneous, stating:
[Plaintiff's expert] did not state that the method used by Mr. Vendetto to lower tools in this case was unsafe. Rather, he felt it would have been better to use mechanical means, such as a hoist, to lower the tools. However, he admitted that the wrap method, which Mr. Vendetto testified he had safely used before to lower tools during a SAM, could have been used. Mr. Vendetto testified, and the trial court found, that Sonat had self-lifting tapes and safety meetings and placards set out with proper lifting techniques shown. The testimony of the other workers, except Mr. Vendetto who could not remember, was that there was a pre-task meeting. The meeting included a drawing of what work needed to be done. The supervisor went over the procedures and instructed the workers as to the tools that would be needed, as well as safety concerns such as oil leaking and the hazards of falling.
Furthermore, Mr. Vendetto's testimony shows that he had lifted heavier loads many times in the past, that he was aware of proper lifting techniques, and, in fact, he had used them in the past. Under the facts of this case, the trial court committed manifest error in finding that Mr. Vendetto was not properly trained in lifting and that this lack of training made the vessel unseaworthy.
96-0626 at p. 7; 701 So.2d at 247-48.
Summarizing, it is internally inconsistent to say that plaintiff lacked proper training in safe lowering and lifting of tools when plaintiff (1) admitted he was trained in safe lifting principles, (2) had eight years off-shore experience, (3) admitted he knew how to accomplish this particular task safely, and (4) previously had accomplished this particular task safely without incident or injury. The court of appeal thus correctly concluded that it was manifestly erroneous to hold plaintiff lacked proper training on safe lowering and lifting. Canter v. Koehring, 283 So.2d 716, 724 (La. 1973); Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96); 676 So.2d 89 (holding that standard of appellate review in admiralty cases decided in state court is not federal standard but rather Louisiana's manifest error standard).

Decree
For the foregoing reasons, the judgment of the court of appeal is affirmed.
JOHNSON, J., dissents.
NOTES
[*] Calogero, C.J., not on panel. Rule IV, Part 2, § 3.
[1] During the six years of employment, plaintiff worked his way up through positions of painter (seaman), roustabout (a job requiring lifting objects up to 100 pounds), motorman 3, motorman 2, motorman 1, motorman, and finally mechanic 3.
[2] A SAM is a routine procedure required every 6,000 hours of operation of the thrusters of the vessel, which serve to maintain the vessel in position over an oil well during drilling. A SAM takes about two days to complete. About six SAMs are done per year aboard the vessel.
[3] Plaintiff's alleged on-the-job neck injury and the causal relationship between that incident and the neck surgery were disputed at trial, but the trial court's factual findings foreclose review of these issues.
[4] In Foster v. Destin Trading Corp., 96-0803 (La.5/30/97); 700 So.2d 199 (on reh'g), this court cited with approval the standard of care announced in Gautreaux, but alluded (as Gautreaux did) to the necessity only of "slight" evidence to meet the burden of proving the causation prong of the liability determination.