757 So.2d 783 (2000)
Derrick SIMS
v.
WOOD TOWING CO., INC.
No. 99-CA-869.
Court of Appeal of Louisiana, Fifth Circuit.
February 16, 2000.
Rehearing Denied March 20, 2000.
Order Granting Rehearing May 1, 2000.
Writ Denied June 30, 2000.
*786 Ford T. Hardy, Howard, Laudumiey, Mann, Reed & Hardy, New Orleans, Louisiana, Attorney for Appellant Derrick Sims.
Charles B. Colvin, House, Kingsmill & Riess, L.L.C., New Orleans, Louisiana, Attorney for Appellee Wood Towing Co., Inc.
Panel composed of Judges CHARLES GRISBAUM, Jr., JAMES L. CANNELLA and MARION F. EDWARDS.
CANNELLA, Judge.
Plaintiff, Derrick Sims, appeals a judgment in a maritime personal injury case which dismissed his suit against defendant, Wood Towing Co., Inc. We affirm in part and reverse in part.
On December 10, 1996, plaintiff was employed by defendant as one of two deck hands assigned to the M/V Perry Lobrano, a towboat captained by Melvin Williams.[1] Plaintiffs job duties included untying and tying the wire cables connecting the grain barges to each other so that the barges could be moved up and down the river for cleaning and for return to the grain elevators for loading. The particular area in which plaintiff was working was the Kenner Fleet, divided into the upper and lower *787 fleet, the wash dock or "condo"[2] and the fleet building area. Loaded barges were in the upper fleet area.
After the barges are unloaded, they are moved to the lower fleet area. Both the upper and lower fleet are located above or north of the condo area. The lower fleet generally contains the dirty barges waiting to be moved down, or south, to the condo, although, occasionally, clean barges are docked there. After being cleaned, the barges are moved down to the fleet building area, where a group of barges are tied together for transport north to be loaded again. The barges are stored side by side in rows projecting into the river called tiers.
On the evening in question,[3] the towboat and the two deck hands were engaged in these operations. The deck crew was equipped with headsets so that they were in constant communication with the towboat Captain. The workers were "stripping a condo", which means moving a barge from the wash dock and taking (or dropping) it down to the northbound tow in the fleet building area. Plaintiff's job was to loosen the head lines, also referred to as wires or cables, which faced upriver. His co-worker, David Christen (Christen), was handling the stern lines, which were on the down river side of the barge. The parties dispute whether plaintiff suffered two distinct accidents. However, plaintiff asserts that he hurt his back twice that night from pulling and straining to loosen two head lines that were stretched tight or had become "filed down" or pinched on a caval. A filed down line often must be cut with an ax to release it. Neither the Captain nor Christen remembered plaintiff complaining about hurting his back the first time. Christen witnessed the second incident in which plaintiff fell down in pain. Plaintiff notified the Captain about his injury and went to the towboat where he completed an accident report. He then left work and drove to the West Jefferson General Hospital emergency room, where he was treated for a lumbar strain/ sprain.[4] In conformity with maritime law, plaintiff was paid cure, his medical expenses, from the date of the accident until April of 1997, at which time the treating physician released plaintiff to work.
Plaintiff subsequently filed suit on November 11, 1997 under the Jones Act, which allows an injured seaman to bring a negligence suit against his employer, 46 U.S.C.App. § 688 (1994), for unseaworthiness and for maintenance and cure. Trial was held on February 9 and 10, 1999. Judgment was rendered in favor of defendant on April 19, 1999. Although the trial judge found that an injury occurred, he determined that plaintiff failed to prove the employer negligent or the vessel unseaworthy. The trial judge also found that plaintiff is not entitled to maintenance since he did not live on the vessel. He further determined that plaintiff reached maximum medical improvement in April of 1997, terminating his right to cure.
On appeal, plaintiff asserts that the trial judge erred in failing to award him maintenance and cure, in failing to find the vessel unseaworthy, in failing to find defendant negligent and in refusing to admit into evidence a document from the U.S. Coast Guard that the river was subject to high water regulations on the day of the accident.
In a seaman's case brought in State court, the federal substantive law applies. *788 Prejean v. Industrial Cleanup, Inc., 98-0948 (La.12/1/98), 721 So.2d 1273.

MAINTENANCE AND CURE
"Maintenance and cure" is an ancient duty imposed upon the owner of a ship to provide food, lodging and necessary medical services to seamen who become ill or injured during service to the ship. Burgess v. C.F. Bean Corp, 98-3072 (La. App. 4th Cir. 8/18/99), 743 So.2d 251; Comeaux v. Basin Marine, Inc., 93-1624 (La. App. 1st Cir. 6/24/94), 640 So.2d 833, 836, writ denied, 94-2307 (La.11/18/94), 646 So.2d 386; Davis v. Odeco, Inc., 18 F.3d 1237, 1245 (5th Cir.1994), cert. denied, Murphy Exploration & Production Co. v. Davis, 513 U.S. 819, 115 S.Ct. 78, 130 L.Ed.2d 32 (1994). Recovery is not dependant upon negligence of the vessel or the owner and the burden of proof in seeking maintenance and cure is relatively light. Id. In addition, generally, a seaman need only prove that the injury arose during his service of the vessel. The seaman does not have to prove a causal connection to his duties. Liner v. J.B. Talley and Company, Inc., 618 F.2d 327, 332 (5th Cir. 1980). Burgess v. C.F. Bean Corp, supra; Comeaux v. Basin Marine, Inc., 640 So.2d at 836.
Maintenance is a form of compensation that arises out of the employment contract and is a daily stipend for living expenses, or an amount covering expenses for the cost of food and lodging that is equivalent to the food and lodging that he would have received on the vessel. Crane v. Diamond Offshore Drilling, Inc., 99-166 (La.App. 5th Cir. 9/15/99), 743 So.2d 780; Springborn v. American Commercial Barge Lines, Inc., 767 F.2d 89, 94-95 (5th Cir.1985). The amount of maintenance to which a seaman is entitled is a question of fact to be decided based upon the evidence presented to the trial court. Springborn v. American Commercial Barge Lines, Inc., 767 F.2d at 95. Cure is payment of the seaman's medical, therapeutic and hospital expenses, until that point in time when plaintiff reaches maximum medical recovery. Fox v. Texaco, Inc., 97 2126 (La.App. 1st Cir. 11/6/98), 722 So.2d 1064, 1067.
Contrary to defendant's assertion and the trial judge's conclusion, maintenance is not restricted to seaman who live and eat aboard the vessel. A seaman who lives ashore is entitled to maintenance, but only upon proof that he was injured in the service of the ship. Liner v. Talley and Co., Inc., 618 F.2d at 332.[5] In this case, plaintiff was a day worker and did not live aboard the vessel, although he testified that there were occasions that he would sleep aboard. Since there is no question that plaintiff suffered some type of injury in the service of the vessel, as found by the trial judge, he is entitled to maintenance.
Defendant argues that one of the exceptions to the seaman's entitlement to maintenance is when the seaman deliberately fails to disclose a pre-existing medical condition. Then the right is forfeited, citing Greaud v. Acadian Towboats, Inc., 628 So.2d 52 (La.App. 1st Cir.1993) and McCorpen v. Central Gulf Steamship Corp., 396 F.2d 547 (5th Cir.1968). Defendant contends that plaintiff failed to disclose several previous accidents in which he claimed to have injured his back.
Plaintiff worked for defendant as a deck hand off and on for six months in 1991, from October to June of 1996 and again from November of 1996 through the date of the present accident in December of 1996. The evidence shows that plaintiff had several previous work related injuries while working for defendant and another while working for Dixie Produce and Packaging Co. He also severed his little finger when he worked as a deck hand for another marine company, J & L Marine, and he was involved in two automobile accidents, one before 1995 and one in 1995.
*789 In his early years working for defendant (1990-1991), plaintiff hurt his back pulling on the barge wires. He was off work approximately one week. He also hurt his wrist in a slip and fall at some time while in defendant's employ. Plaintiff again injured his back in 1993, while working for Dixie Produce. In 1995, while working for defendant, plaintiff suffered a knee injury when he attempted to catch a falling wire. In the earlier of the two automobile accidents (date unknown), he stated that he was rear-ended and admitted that he hurt his back in that accident. In 1995, plaintiff was in another automobile accident. In that petition he claims that he suffered a back injury and property damage. However, plaintiff testified at the instant trial that he did not hurt his back in that accident and that he only intended to sue for his property damage. In April of 1996, while working for defendant, plaintiff claimed that he sprained the upper-middle part of his back pulling a wire out of the water. Then in December of 1996, he had the accident or accidents that gave rise to this action.
Two of the accidents in which plaintiff was involved prior to the one here, occurred while he was working for defendant in the same capacity as a deck hand. In one, his back injury claim arose from similar circumstances as here and he was out of work for one week. When he sprained his back another time, he was out for approximately the same time. Although plaintiff may not have put these accidents on his employment application, the injuries were reported when they occurred and were in the defendant's records. Thus, defendant was privy to the information that plaintiff had suffered two previous back injuries. Therefore, we find that the bar to receiving maintenance does not apply in this case and that plaintiff is entitled to maintenance. Therefore, we will amend the judgment to award plaintiff maintenance based on his living expenses[6] to the date of maximum medical improvement.
Plaintiff produced evidence of his living expenses at trial. Since he shares an apartment with his girlfriend, we will award him $23 per day, which is his expenses minus½ of the shared expenses of rent, utilities and telephone, as follows:

Rent $200.00 (½ of $400)
Utilities 100.00 (½ of $200)
Two Loan payments totaling 212.50
Credit Card ($3,000 balance) 50.00
Telephone 37.50 (½ of 75.00)
Automobile Gasoline 50.00
Automobile Insurance 85.00
Miscellaneous 100.00
 _______
Total $810.00 (÷ 356 days/
 year = $23/
 day)

In regard to the cure payments, the trial judge found that plaintiff is entitled to cure, but that he reached maximum medical improvement on April 1, 1997. He based this decision on the testimony of Dr. Daniel Gallagher, who treated plaintiff from the date of the accident until April 1, 1997.
Dr. Gallagher, an orthopedic surgeon, saw plaintiff the day after the accident. He noted that plaintiff's history showed two prior back injuries during other periods that plaintiff was employed by defendant. Plaintiff complained about low back pain on his right side. The examination disclosed very decreased motion, but no spasms. The doctor diagnosed a lumbar strain and referred plaintiff to physical therapy. He prescribed anti-inflammatory medications.
Dr. Gallagher saw plaintiff again on December 20, 1996, at which time plaintiff *790 showed some improvement. He had 80% of normal range of motion, but no spasms. Plaintiff was continued on the same treatment. He released plaintiff for light duty work only. Plaintiff returned on January 10, 1997. He had been doing light duty work, but was still in pain. At that point, plaintiff had completed his physical therapy. The doctor ordered new x-rays, which showed no abnormalities. Dr. Gallagher diagnosed plaintiff with a resolving back strain. He renewed the physical therapy, changed plaintiffs medications and continued him on light duty.
On February 7, 1997, plaintiff told the doctor that he was 95% improved. He had full range of motion and full strength in the spine and lower extremities. Plaintiff had finished his physical therapy regime and Dr. Gallagher released him for regular duties. He did not think plaintiff had reached maximum medical improvement, yet. However, plaintiff returned on February 21, 1997 complaining that the work was aggravating his symptoms. He had increased pain, decreased range of motion to 50% and was tender to palpate. The doctor did not find any signs of nerve impingement, but ordered a Magnetic Resonance Imaging (MRI) test. At this point, Dr. Gallagher thought that he either aggravated his back by his manual labor or was starting to show signs of malingering.
The MRI was taken on February 24, 1997. Dr. Gallagher stated that it showed a slight bulge on the last disc, L5-S1. He testified that it was not ruptured or herniated or extruded. He stated that the bulge protruded to the left side and there was no indication of nerve root impingement. All of plaintiffs complaints had been to the right side of his low back.
On February 28, 1997, plaintiff still complained of right side back pain. As previously, he did not mention radiating leg pain. The doctor then told plaintiff that the symptoms were not consistent with the left side bulge. However, he kept plaintiff on light duty. Plaintiff returned on April 1, 1997 with the same complaints, but had a normal examination. Because the doctor did not find the symptoms consistent with the MRI results, at that point, he told plaintiff that he had reached maximum medical improvement because there was nothing further he could do. Since he could not find any problem, the doctor testified that there was no need for further studies or surgery. However, he told plaintiff to get a second opinion if he felt he could not return to regular duties.
Dr. Gallagher testified that the size or existence of the bulging disc was not significant in light of the clinical findings. He stated that although possible, it was not common for a patient to have pain that alternates from one side to the other, unless the problem is in the mid-line or central disc bulge. This was however, pretty far off to the left side. He reiterated that the disc was not ruptured, which is a tear in the sac containing the disc cushioning material. Furthermore, he notes the absence of any leg pain complaints during his treatment of plaintiff. Although he stated no other tests were necessary, he agreed that a discogram could be performed to rule out faking, but noted that the test is expensive, invasive and not necessary here because this disc is not bad enough. Dr. Gallagher felt that the discogram test is controversial.
Plaintiff next saw Dr. Frank Culicchia, a neurosurgeon, on one occasion on April 7, 1997. In giving his history, plaintiff denied having any previous back injuries. Dr. Culicchia stated that plaintiff complained of radiating pain in the left side of his back and down the lateral aspect of the thigh. Plaintiff claimed that both his hips were numb. No spasm was detected. When the doctor reviewed the MRI, he found that the symptoms correlated with the left side bulge and a nerve root impingement was possible. However, subsequently, the doctor discovered that plaintiff had been seen by Dr. Gallagher and was provided with his reports that showed plaintiff had consistently complained of right side pain, but never mentioned left *791 side pain or radiating pain until after Dr. Gallagher told him the results of the MRI. As a result of this information, Dr. Culicchia revised his original report. He was not sure if plaintiff was honest about his complaints because his symptoms with Dr. Gallagher do not correlate with the abnormalities on the MRI. Although he has had patients with alternating side pain, he finds that they rarely have any structural abnormality to account for it. He stated that a mid-line bulge will rarely cause alternating side pain. Dr. Culicchia testified that he does not believe that plaintiff has a nerve root impingement. Further, he would never perform a discogram. He would recommend re-training for plaintiff if his back is problematic.
Dr. John Vitter, a diagnostic radiologist, interpreted the MRI. He found mild dehydration of the discs, a disc protrusion on the left, extending into the foramen at the inferior portion. He defined the bulging disc as concentric posterior projection without any irregularity to the margins of the disc. A protrusion is a focal extension of the disc out from its normal contour. He stated that his measurements indicated that the bulge was moderate in size. Further, it is focal or localized on the left side of the spine, not near the mid-line. It becomes more apparent as it goes left-ward. However, Dr. Vitter stated that he found no impingement of the nerves. If it had been impinging, the patient would have had leg pain on the left side. Dr. Vitter stated that a protrusion has a potential of producing more pathology. Dr. Vitter noted that the MRI results should be put in context with the symptoms. Further, at plaintiff's age, it is likely that an accident caused the protrusion, although it can occur from degeneration.
Finally, Dr. Stuart Phillips, plaintiff's treating orthopedic surgeon, testified. He first saw plaintiff on June 5, 1997. Plaintiff reported a history of the injury and resulting back and leg pain. Plaintiff told him that he had back pain radiating into the right leg from the thigh, aching thigh, giving way of the leg and pain with coughing and sneezing and knee pain. Although he was not aware of plaintiff's previous knee problems, the doctor stated that plaintiff's knee could be affected by his back. On examination, the doctor found plaintiff had less than 25% of normal movement, right paravertebral muscle spasm, no weakness, low lumbar tenderness and positive straight leg raising tests on both sides. He interpreted the MRI as showing a "huge" lumbar herniated disc, which he also referred to as a bulging disc. He said the disc bulge was located at midline, a little more to the left side, but present on both sides. Dr. Phillips stated that it was easy to see the nerve root impingement, although a better test for that is an Electromyography (EMG) or by physical examination. Dr. Phillips noted that a large bulging disc can produce no pain, while a smaller one can produce great pain. He explains that the reason is the pain is due to inflammation and chemical changes, not from the mechanical changes. That is why an EMG or nerve conduction studies are more reliable. In addition, plaintiff's positive straight leg tests results indicate nerve irritation. After the first visit, the doctor suggested plaintiff obtain physical therapy and return in 6 weeks.
Dr. Phillips saw plaintiff again in August and October of 1997, January 20, 1998 and May 5, 1998. Plaintiff's condition waxed and waned. He exhibited spasms in the January exam, but was up to 75% of normal movement. In May, plaintiff reached a "steady" state. According to Dr. Phillips, plaintiff was not well and not going to get better. Plaintiff saw Dr. Phillips again in August and October of 1998. Plaintiff was exhibiting moderate to severe pain, with occasional radiating pain into both lower extremities. He had spasms and his motion was limited.
Phillips stated that plaintiff's prognosis is poor for returning to heavy labor. He stated that plaintiff needs re-training, but is not a candidate for invasive procedures *792 yet. The doctor stated it was reasonable to have a vocational rehabilitation specialist try to find out if plaintiff could perform light work. If not, then the doctor would recommend trying to fix his back. He would like to perform a discogram to see how many discs are involved and if the disc could be improved with surgery. He testified that a discogram procedure is not controversial and support for their use is found in the American Academy of Orthopaedics and North American Spine Society. Dr. Phillips disagreed with Dr. Gallagher that plaintiff had reached maximum medical improvement because all of the available therapeutic remedies had not yet been exhausted. Those include cortisone injection, discogram, followed by a Computerized Axial Tomography (CT) scan to see the number of discs involved and surgery. In addition, plaintiff is still suffering spasms and limited motion. Dr. Phillips further testified that plaintiff could be experiencing intermittent pain from left to right because the bulge is at mid-line. He concluded that the problem is trauma related. Further, even though plaintiff had prior back injuries, if he had no pain within 6 months of this accident, then this present pain is the result of a new accident. Dr. Phillips stated he would be able to determine if the problem could be fixed within another 6 months, if he could perform the discogram. He concluded that plaintiff has some nerve impingement.
The trial judge found that plaintiff reached maximum medical improvement in April of 1997, pursuant to Dr. Gallagher's testimony. Under the manifest error standard of review, the appellate court may not overturn the factual findings of the trial judge when there is conflicting evidence. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Brown v. Seimers, 98-694 (La.App. 5th Cir. 1/13/99), 726 So.2d 1018, 1021.[7]
Here, plaintiff exhibited symptoms on one side consistently until he was informed that his bulging disc was on the other side. A few days later, he exhibited left sided symptoms, including leg pain, for the first time. Although we do not doubt that it is possible for a protruding disc to produce alternating pain, Drs. Vitter, Gallagher and Culicchia testified that the bulge was on the left side and it was unlikely to produce right side pain. In addition, the medical testimony was conflicting regarding the size of the bulge and whether it is impinging on the nerve. Under our standard of review, we find that the trial judge had a reasonable basis supported by the record to accept the opinion of Dr. Gallagher that plaintiff reached maximum medical improvement in April of 1997. Thus, we find no manifest error in the ruling of the trial judge that plaintiff is not entitled to an award for cure past that date.

JONES ACT NEGLIGENCE AND UNSEAWORTHINESS
The appropriate standard of review in a Jones Act and unseaworthiness claim is the manifest error or the clearly wrong standard. Foster v. Destin Trading Corp., on rehearing, 96-0803 (La.10/21/97), 700 So.2d 199, 202.
The Jones Act allows the seaman to sue his employer for negligence. 46 U.S.C.App. § 688 (1994). Seamen are allowed to bring their Jones Act claims in state court pursuant to the "saving to suitor" clause of the Judiciary Act of 1789. Foster v. Destin Trading Corp., 96-0803 (La.11/6/97), 700 So.2d 199, 209. In matters involving admiralty and maritime *793 jurisdiction, the saving-to-suitor clause permits state courts to have concurrent jurisdiction with the federal district courts. Foster v. Destin Trading Corp., 700 So.2d at 209.
The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery. Foster v. Destin Trading Corp., 700 So.2d at 208. The employer's negligence may arise in many ways, including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. Foster v. Destin Trading Corp., 700 So.2d at 208; Davis v. Hill Engineering, Inc., 549 F.2d 314, 329 (5th Cir.1977).
In determining a Jones Act case, the jurisprudence holds that both the employer and seaman are subject to a duty to exercise reasonable care under the circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 338 (5th Cir.1997); Vendetto v. Sonat Offshore Drilling Co., 97-3103 (La.1/20/99); 725 So.2d 474, 482; Foster v. Destin Trading Corp., 700 So.2d at 208. In Foster, the Supreme Court cited with approval the standard of care announced in Gautreaux, but alluded (as Gautreaux did) to the necessity only of "slight" evidence to meet the burden of proving the causation prong of the liability determination. This was followed in Vendetto v. Sonat Offshore Drilling Co., 97 3103 (La.1/20/99), 725 So.2d 474, 482. The Court in Vendetto stated:
Nevertheless, since the duty to provide a safe place to work allocates substantial risks of maritime employment to the employer, identical conduct is not demanded of the employer and the employee... The law allocates different risks to different parties, and that allocation forms parts of the reasonableness equation in the negligence determination. A defendant's standard of care, like that of the plaintiff, varies according to the conduct in which the party is engaged.
Vendetto v. Sonat Offshore Drilling Co., 725 So.2d at 479.
In regard to unseaworthiness, the owner of vessel has an absolute and nondelegable duty to furnish a seaworthy vessel. Foster v. Destin Trading Corp., 700 So.2d at 209. In Foster, the Louisiana Supreme Court stated:
This duty ... extends to a defective condition of the ship, its equipment, or appurtenances ... A ship's equipment and appurtenances include most objects and things on or attached to the vessel regardless of whether the item belongs to the ship or is brought aboard by a third party....
A breach of the duty of seaworthiness gives rise to a claim for general damages. The plaintiff bears the burden of proving that "the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness....
The test for determining unseaworthiness is one of reasonable fitness. The vessel, its equipment, and appurtenances need not be perfect, but all must be reasonably fit for their intended use ... Unseaworthiness, then, is a relative term dependent on the circumstances. For example, a valve stem wrapped in duct tape created an unseaworthy condition because it could no longer be opened by hand, the intended method of operation, to regulate the flow of liquid cargo ... In contrast, an automatic valve that did not close completely did not constitute unseaworthiness when steam and hot water escaped from it and injured a worker. The court determined that its intended purpose was not to safeguard workers from escaping steam, but instead to maintain pressure inside the ship's boiler, and the automatic valve *794 did not have to close completely to perform this function....
Foster v. Destin Trading Corp., 700 So.2d at 209 [Citations omitted].
The unseaworthiness of a vessel results from a defective condition, not the result of an isolated negligent act. Foster v. Destin Trading Corp., 700 So.2d at 204; See: Meyers v. M/V EUGENIO C, 842 F.2d 815, 817 (5th Cir.1988). Furthermore, a plaintiffs own fault will proportionately reduce his recovery for injuries caused by unseaworthiness and, if the seaman's own negligence was the sole cause of his injuries, recovery will be barred. Foster v. Destin Trading Corp., 700 So.2d at 204-05.
In this case, plaintiff asserts that the ship was unseaworthy and the employer was negligent because defendant was violating the high water rule established by the U.S. Coast Guard, 33 CFR 165.803. The rules require that two towboats be in attendance when "A) Barges are withdrawn from or moved within the fleet and the fleet at the start of the operation contains eight or more barges; or B) Barges are added to the fleet and the number of barges being added plus the fleet at the start of the operation total eight or more." On the date of plaintiffs injury, another towboat was in the vicinity, but not directly attending plaintiffs boat.
Plaintiff argues that in addition to violating the regulations, a second boat was necessary because high water put greater pressure on the barge lines. He stated that the high water creates a stronger current pushing against the barges that were tied head (north) to stern (south). Plaintiff argues that this, additional pressure was placed on the head lines that he had problems with that night and that he had to pull and strain more than usual to get the head lines released. He argues that had there been a second towboat to help maneuver the barges, he would not have had to pull so hard and long to loosen the wires, because two towboats could have created slack in the lines. Third, plaintiff asserts that a second boat would have provided additional lights that would have shown that Christen was on the wrong barge during the first incident, thereby saving plaintiff from working on the head line that would not loosen without the stern line first being released.
Even had the water been high, Captain Williams testified that barge lines routinely get tight due to driftwood getting between the barges so that the barges cannot be pushed together when the towboat pushes them to create slack in the lines. The Captain stated that sometimes the lines get so wrapped up that they cannot be removed without cutting them. The Captain testified that the current would not have caused the lines to tighten and that a second towboat would not have been needed to maneuver the barges to loosen the lines in this case because these barges were empty. The Captain stated that one towboat was sufficient to maneuver two empty barges without any problem whatsoever.
Relative to high water, the Captain noted that it is much harder to move a loaded barge out of a tier (row) in high water and that the biggest problem in high water is keeping multiple barges together as they are being moved up or down the river. Only in those instances would a second barge be necessary.
Both Captain Williams and Christen testified that when a wire becomes too tight, or "filed down" and neither the deck hand or the towboat can release it, the deck hands are authorized to cut the line with an ax. Both plaintiff and Christen testified that the second problem line was "filed down." Because of this, Christen could not understand why plaintiff kept pulling on that line, rather than cutting it. Both the Captain and Christen noted that "filed down" wires occur fairly frequently and that it is the job of the deck hands to decide whether to cut a line. Neither the Captain nor Christen remembered plaintiff *795 complaining about his back until he fell down and had to go to the hospital.
Plaintiff testified that the problem with the first line was that there was driftwood between the barges. This is in conformity with the Captain's testimony regarding the cause of a tightened cable. However, plaintiff claims that, after some discussion with the Captain about the line, the Captain told him to keep trying to loosen it as the Captain maneuvered the towboat. Christen was supposed to be on the stern, loosening the stern line first. That makes it easier to loosen the head line. However, plaintiff testified that he pulled on the lines for 20 minutes before he discovered that Christen was on the wrong barge. Without Christen to loosen the stern line as he was supposed to be doing, it made it harder for one towboat to maneuver the barges to create slack. Finally, when he could not get the line loose, plaintiff went to check on the stern line and discovered that Christen was on the wrong barge. Once Christen loosened the correct cable, plaintiff said he was able to remove the line. By that time, plaintiff stated, his back burned and was tense. Plaintiff argues that had a second towboat been in attendance, the additional lights would have shown that Christen was on the wrong barge and plaintiff would not have strained to get the line loose. When he did feel pain, plaintiff claimed that he told the Captain, but he did not fill out an accident report or quit working. Christen denied that he was on the wrong barge and the Captain did not recall plaintiff telling him that Christen was on the wrong barge. In addition, neither the Captain nor Christen recalled plaintiff telling anyone he hurt his back trying to untie that first wire.
The second incident occurred after the crew moved the first barge out of the tier. Sometime later, they ran into another problem with a tight head cable. In this instance, plaintiff testified that the head line was "filed down." However, plaintiff worked on the line trying to release it for 15-20 minutes before it came loose, even though his back was still hurting from the first incident. After the line was freed, plaintiff stated that his back hurt so badly that he fell to the ground. Christen saw him fall down in pain and plaintiff went to the wheelhouse to report the injury.
Plaintiff testified that he did not cut the line because cutting a line is not encouraged. However, the safety and policy manuals instruct the workers not to pull on a tight line without help and company policy discourages conduct that would cause injury to the worker. Although plaintiff said he did not know there was such a policy, he testified that he probably had been given a manual. He also testified that he could have cut the lines and had done so in the past. Plaintiff also knew that company policy required him to immediately report any injury, however small.
Plaintiff admitted that the high water did not have anything to do with the tight wire. He testified that the first wire was tight because of driftwood. He further stated that once Christen got on the correct barge, they had no problem getting the head line loose. Plaintiff also noted, as the Captain stated, that one towboat was sufficient to move the empty barges around that night.
The trial judge found that there was no evidence of high water at the time of the accident. The only evidence that the water was high and under special Coast Guard regulations was plaintiff's testimony and the fact that this particular towboat sank one month later in high water. Neither the Captain nor Christen could recall if the water was high the night plaintiff was injured. This was a factual finding by the trial judge. Based on the testimony, we find no manifest error in the trial judge's ruling that plaintiff failed to prove that the water was high and subject to the Coast Guard high water regulations. Thus, there was no unseaworthiness or negligence for that reason. Furthermore, we find that plaintiff failed to prove that, *796 even if the water was high, the attendance of a second towboat would have prevented the injury or that the failure to have a second towboat was a proximate cause of the injury.
The trial judge also found that plaintiff failed to prove that defendant was negligent. The trial judge apparently believed that Christen was not on the wrong barge and that the Captain was not informed of any incident related to the first tight cable, as he should have been. We find no manifest error in that finding. In addition, even if Christen had been on the wrong barge, we find that the vessel was not unseaworthy for that isolated act, nor was defendant negligent because of it. Further, neither defendant nor its employees performed any other act that violated defendant's duty of reasonable care for the safety of plaintiff.[8]

EVIDENCE
Plaintiff also asserts that the trial judge erred in refusing to admit into evidence written documentation by the Coast Guard that the Mississippi River was under high water regulations on the date of the accident. Plaintiff claims that he requested the information prior to trial, but did not receive it until after the trial. Since the trial ended without the evidence, its admission after the trial was within the trial judge's discretion. Based on the facts, we cannot say that the trial judge abused his discretion in this matter.
Accordingly, we hereby affirm the trial court judgment finding no liability for unseaworthiness or negligence on the part of defendant. We further affirm the judgment denying to plaintiff an award of cure, or payment of additional medical expenses. We reverse the judgment as to plaintiffs entitlement to maintenance and award plaintiff a daily stipend of $23 day from the date of the injury until the date of maximum medical improvement, with legal interest until paid.
Defendant is to pay costs of this appeal.
AFFIRMED IN PART; REVERSED IN PART.
REHEARING GRANTED.
We reconsider our denial of Defendant's Motion for Rehearing and grant the rehearing for the purpose of amending our opinion. We awarded Plaintiff maintenance payments, but failed to credit Defendant for those purely maintenance amounts already paid to Plaintiff. As we noted in our opinion, these are separate from medical expense payments. We herein amend our decree to reflect the credit.
Accordingly, we hereby affirm the trial court judgment finding no liability for unseaworthiness or negligence on the part of Defendant. We further affirm the judgment denying to Plaintiff an award of cure, or payment of additional medical expenses. We reverse the judgment as to Plaintiff's entitlement to maintenance, and award Plaintiff a daily stipend of $23 per day from the date of the injury until the date of maximum medical improvement, with legal interest until paid. Defendant is to be given credit for any maintenance payments made to Plaintiff.
Defendant is to pay costs of this appeal.
AFFIRMED IN PART; REVERSED IN PART.
NOTES
[1] The parties stipulated that plaintiff was a seaman.
[2] The area is apparently referred to as a condo because a trailer is located on it.
[3] The accident occurred between 10:00 p.m. and 11:00 p.m.
[4] Although there was a dispute as to whether he first injured his back that evening shortly before this incident while he was performing the same job on another tight line, the trial judge found that an injurious event occurred and plaintiff suffered a injury. Since defendant did not appeal this finding, the issue of whether an injury occurred is not before us. However, defendant argues the issue in regard to plaintiff's credibility as to the extent of the injury.
[5] A blue water seaman, on the other hand, can recover for an injury suffered during shore leave while on personal business. Liner v. Talley and Co., Inc., 618 F.2d at 332.
[6] A seaman's own testimony is competent evidence of the amount of maintenance. Springborn v. American Commercial Barge Lines, Inc., 767 F.2d 89, 94 (5th Cir.1985). Further, we do not need to remand for a determination of the value of food and lodging on board this ship, pursuant to Crane v. Diamond Offshore Drilling, Inc., 99-166 (La.App. 5 th Cir. 9/15/99), 743 So.2d 780 and Springborn v. American Commercial Barge Lines, Inc., 767 F.2d at 94-95 above. Those cases involved seaman who actually lived aboard the ship. This case is distinguishable as plaintiff here is a day worker. Thus, we will allocate his stipend based solely on his living expenses.
[7] However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error, even in a finding purportedly based upon a credibility determination. Brown v. Seimers, 726 So.2d at 1021; Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989).
[8] In fact, plaintiff failed to take reasonable care for his own safety. He had previously injured his back in other accidents and should have been cautious about re-injuring it. Yet, he continued to pull on the line for an inordinate amount of time, even after his back began to hurt. Although he could have cut the wire cable or asked for assistance, he did not do so. He then compounded the problem by continuing to work that night, thereby risking a more severe injury. At the very least, plaintiff contributed to his injury. However, since we find no error in the trial judge's ruling that the vessel was not unseaworthy and defendant not negligent, plaintiff's fault is moot.